96 So.2d 298

Rhonda Belle MARTIN, alias, etc.,

v.

STATE of Alabama.

3 Div. 784.

Supreme Court of Alabama.

March 14, 1957.

Rehearing Denied June 27, 1957.

John Patterson, Atty. Gen., and Edmon L. Rinehart, Asst. Atty. Gen., for the State.

GOODWYN, Justice.

Appellant, Rhonda Belle Martin, was convicted of murder in the first degree and sentenced to death by electrocution. Her appeal here is under the provisions of the automatic appeal statute. Act No. 249, approved June 24, 1943, Gen.Acts 1943, p. 217, Code 1940, Tit. 15, § 382(1) et seq., Pocket Part.

The indictment charges that appellant "unlawfully and with malice aforethought killed Claude C. Martin by administering to him a quantity of arsenic, a poison, against the peace and dignity of the State of Alabama." She entered pleas of "not guilty" and "not guilty by reason of insanity."

The deceased, Claude C. Martin, was appellant's husband.

■ After laying a proper predicate, the state introduced in evidence the defendant's signed confession admitting that she had placed poison in her husband's coffee over a period of several months preceding and during his fatal illness. It is undisputed,

Geo. W. Cameron, Jr., Montgomery, for appellant.

and clearly appears from the record, that the confession was voluntary.

The confession, made in the form of questions and answers, contains the following references to defendant's marriage to her husband's son:

"Q. Did he [the deceased] have an automobile? A. Yes sir.

"Q. Was there any kind of insurance policy on that automobile that it paid up at his death? A. Yes sir.

"Q. What kind? What kind of automobile was it? A. A '49 Hudson.

"Q. Did you inherit anything else from him? A. No sir. I don't think there was anything else.

"Q. When did you start going with his son? A. Well, it was three or four months after he died.

"Q. Did his son live with him? A. He was in the Navy.

"Q. In the Navy the whole time you were married? A. Yes sir. ·

"Q. When did he get out? When was he discharged? A. This February two years ago.

"Q. He was in the Navy when you married him? A. Yes sir.

"Q. Where did you move after Mr. Martin died? Claude Martin died? A. 519 Montgomery Street.

"Q. Did he own any real estate? A. No sir.

*    *    *    *    *    *

"Q. You gave him three or four more doses? And the last dose was two or three weeks before he died? A. No sir, longer than that, a month or more before he died.

"Q. After Mr. Martin's death, you married his son? A. Yes sir.

"Q. How long after? A. December 7, 1951, that would have been how long after his death.

"Q. How long after Mr. Martin's death? A. He died in April, about eight months, I guess.

"Q. You did all the cooking there at the house [of the deceased]? A. Practically all of it, most of it."

Code 1940, Tit. 34, § 1, as amended by Act No. 296, approved. Aug. 18, 1947, Gen.Acts 1947, p. 148, to the extent here pertinent, provides that "the son must not marry his * * * step-mother", and declares such marriage to be incestuous.

Code 1940, Tit. 14, § 325, makes such incestuous marriage a felony punishable by imprisonment in the penitentiary for not less than one nor more than seven years.

■■■ Counsel for appellant insists that defendant's marriage to her deceased husband's son was incestuous and for this reason it was error to receive in evidence that part of the confession admitting such marriage. The argument is that such admission relates to a criminal offense entirely separate and apart from the offense for which the defendant was being tried and hence it was reversible error to receive it in evidence. Sims v. State, 253 Ala. 666, 669, 46 So.2d 564; 20 Am.Jur., Evidence, § 489, p. 426; Wharton's Criminal Evidence, Vol. 2, § 361, p. 74. We cannot agree that the marriage was incestuous and violative of § 1, Tit. 34, as amended, supra. What was said in Tagert v. State, 143 Ala. 88, 90–91, 39 So. 293, 111 Am.St.Rep. 17, is conclusive on the point, viz.:

"'Incest,' says Mr. Bishop, 'where the statutes have not modified its meaning, is sexual commerce, either habitual or in a single instance, and either under a form of marriage or without it, between persons too nearly related in consanguinity or affinity to be entitled to intermarry.' Bishop on Statutory Crimes, § 727. Section 4889 of the Criminal Code of 1896 [Code 1940, Tit. 14, § 325, supra] reads as follows: 'If any man or woman, being within the

degrees of consanguinity or relationship within which marriages are declared by law to be incestuous and void, and knowing of such consanguinity or relationship, intermarry, or have sexual intercourse together, or live together in adultery, each of them must, on conviction, be imprisoned in the penitentiary for not less than one, nor more than seven years.' The degrees of consanguinity or relationship within which marriages are declared incestuous are fixed by section 2837 of the Civil Code of 1896 [Code 1940, Tit. 34, § 1, as amended, supra]. One of these degrees is, as known in common parlance, that of step-father and step-daughter. The language is that 'No man shall marry the daughter of his wife.' [As applicable to this case the provision is that "The son must not marry his * * * stepmother."]

"It cannot be seriously doubted that the relation of consanguinity or affinity between the parties must exist at the time the act of intermarrying or sexual intercourse occurs. If the relationship, previous to the time when the act of marrying or sexual commerce takes place, has ceased to exist, then the act of intermarrying or sexual intercourse is not incestuous, however offensive it may appear to good morals, or punishable as a crime under other criminal statutes."

See, also, Henderson v. State, 26 Ala. App. 263, 157 So. 884.

Although it was held in the Tagert case that "after the death of the wife living issue of the marriage continues the affinity between the husband and her blood relations", that principle has no application to the case before us. There is no evidence indicating any issue, living or dead, of the marriage of defendant and her deceased husband, Claude C. Martin.

The only defense offered was that the defendant was insane at the time of the commission of the alleged murder. The principal witness for the defense was a psychiatrist who testified that he had examined the defendant and in his opinion she was a schizophrenic. He further testified that schizophrenia is a permanent mental disorder that exists throughout the life of one afflicted, and that the defendant was probably a schizophrenic at the time she poisoned her husband. Expert opinion evidence to the effect that the defendant was sane was offered in rebuttal by the state.

It is insisted here that, in view of the position taken by the defendant that she was a schizophrenic, several remarks made by the trial judge while qualifying the jury had the effect of creating a strong prejudice in the minds of the prospective jurors against the accused's defense of insanity. The trial judge, apparently at the request of the defense, questioned each successive group of prospective jurors as to whether any of them was familiar with the term "schizophrenic" or the symptoms of "schizophrenia". The following exchanges contain the remarks to which appellant objects:

"The Court. Are each of you familiar with the term 'schizophrenia'? It was explained a while ago.

"Mr. Cameron. Judge, the word, 'a dual personality,' is misleading. It is insanity, definitely applied to insanity.

"The Court. I am sure they are not familiar with that, because the court is not. I am sure they are not familiar.

"(No response.)

\*      \*      \*      \*      \*      \*

"The Court. Each of you familiar with the term 'schizophrenic' or the symptoms of schizophrenia? I know you are not. Do any of you all know anything about that?

"A Juror: I don't know what it is.

"The Court. I don't know much myself.

"Mr. Cameron. If you will, have them identify themselves.

"The Court. All right.

"(The jurors at the rail identified themselves.)

"The Court. You are qualified.

"The Clerk. Next group.

\*    \*    \*    \*    \*    \*

"The Court. That is no disqualification? Any of you familiar with the term 'schizophrenic' or know the symptoms of schizophrenia?

"A Juror. I am not familiar with them.

"The Court. I am sure you are not.

"A Juror. Just what do you mean by that?

"Mr. Cameron. It is a type of insanity where a person loses contact with realization. In other words, they have no control over their actions. *Skis-o-frenia* is the correct pronounciation of it, I believe.

"The Court. You want their names called?

"Mr. Cameron. Yes, sir; please.

"The Court. All right. Start."

■ The sole defense, as already noted, was the defendant's insanity. Counsel for defendant sought to prove that at the time she poisoned her husband she was suffering from schizophrenia and was not legally responsible for her actions. It is contended that the remarks of the trial judge struck at the very heart of this defense by making light of it before the prospective jurors. We have carefully examined the comments of the trial judge in the light of the entire record and cannot see how it can be said that such comments prejudiced the jury against defendant. The expert witness for the defense was allowed to explain to the jury the meaning of schizophrenia and to state in detail its symptoms and effects, and the trial court, in its oral charge, clearly and correctly stated the test which the jury should apply in determining whether insanity had been proved as a defense. We see no merit to the insistence that the defendant was prejudiced by any of the comments made by the trial judge.

■ We have carefully considered all of the testimony, even though no lawful objection or exception was made thereto, as is required of us, and we do not find any testimony that was seriously prejudicial to the rights of the appellant; nor can we say, upon consideration of all the testimony, that the verdict is so decidedly contrary to the great weight of the evidence as to be wrong and unjust, which would call for an order reversing the judgment and granting a new trial. Code 1940, Tit. 15, § 382(10), Pocket Part; Act No. 249, approved June 24, 1943, Gen.Acts 1943, p. 219, § 10, supra. The verdict is amply supported by the evidence.

No error to reverse appearing, the judgment is due to be, and is, affirmed.

Affirmed.

All the Justices concur.

On Motion for Rehearing.

It is insisted by counsel for appellant that we erred on original deliverance in holding it was not reversible error to receive in evidence that part of defendant's confession relating to her marriage to her deceased husband's son. It is argued that such admission, in the absence of an affirmative showing by the state that there was no living issue of the marriage of defendant and her deceased husband, "tends" to establish a separate crime, and for this reason should have been excluded from the confession. In answer to this we quote again the following from Tagert v. State, 143 Ala. 88, 91, 39 So. 293, 294, 111 Am.St. Rep. 17, supra: "If the relationship, previous to the time when the act of marrying \*    \*    \* takes place, has ceased to exist, then the act of intermarrying \*    \*    \* is not incestuous." The confession itself

shows the death of the husband, thus bringing about a cessation of the relationship unless there be living issue of the marriage. We do not think it was incumbent on the state to negative a continuance of the affinity by an affirmative showing that there was no living issue of the marriage of defendant and her deceased husband. Futhermore, it seems to us, as argued by the state, that evidence of defendant's marriage to her deceased husband's son was relevant and admissible to show a motive for the poisoning of the husband, that is, to get rid of him so that she could marry his son.

We have again reviewed the entire case and find nothing in the record calling for a reversal.

Rehearing denied.

All the Justices concur except STAKELY, J., not sitting.

John Patterson, Atty. Gen., and Edmon L. Rinehart, Asst. Atty. Gen., for the State.